# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

IMAX CORPORATION,                                              :

                                            Plaintiff, :        Index No.:

                                                              :        **VERIFIED COMPLAINT**
            - against -
                                                              :        **JURY TRIAL DEMANDED**

CINEMARK USA, INC.,                                           :

                                            Defendant. :        0 9 6 0 3 4 4 1
                                                              :

-----------------------------------------------------------------x

    Plaintiff IMAX Corporation ("IMAX"), by and through its attorneys Shearman &

Sterling LLP, as and for its complaint against Defendant Cinemark USA, Inc. ("Cinemark"),

alleges as follows:

                                   <u>NATURE OF THIS ACTION</u>

    1.       IMAX is a world-renowned innovator of entertainment technology that, for five

decades, has specialized in the design and manufacture of highly proprietary, premium quality,

large-format, immersive theatre systems. Since 1997, Cinemark—one of the largest movie

exhibitors in the world—has been a valued customer of IMAX. As IMAX has recently come to

learn—and as set forth in detail herein—Cinemark is also an inveterate tortfeasor and a faithless

contract party. In this action, IMAX seeks redress for Cinemark's willful breach of contract,

fraud, tortious interference with existing and prospective economic relations, breach of the

implied warranty of good faith and fair dealing, misappropriation of trade secrets, unjust

enrichment and deliberate acts of bad faith.

    2.       Separate and apart from the actual technological components of IMAX's theatre

systems, IMAX has since its inception in 1967 dedicated significant time and resources,

including hundreds of millions of dollars, to the extensive research and development, marketing

and promotion of a highly proprietary, immersive theatre experience that is unique to IMAX. There can be no doubt that IMAX is in a class of its own in this regard or that IMAX succeeds, not only because of technological innovation, but because of the overall superiority of the product that it has created and the entertainment services that it offers. The IMAX® brand is identifiable worldwide and is synonymous with the highest-quality movie-going experience available. There are approximately 400 IMAX® theatres in the world in over 40 countries and well over a billion people have seen an IMAX film. IMAX earns revenue primarily through the sale or lease of its systems to exhibitors, and through the integral and invaluable relationships that it has fostered with Hollywood studios over a number of years.

3.    This dispute arises from a long-standing, and—until recent events revealed the ugly truth to IMAX—seemingly honest business relationship between the parties that began in the late 1990s. Cinemark is an exhibitor of motion pictures and an owner of numerous multiplex movie theaters across the Americas. Prior to the events at issue in this dispute, Cinemark's multiplexes housed standard, conventional-sized and shaped projection auditoriums, completely unlike the theaters designed and created by IMAX. Beginning in 1997, IMAX and Cinemark entered into a series of contracts that provided for the installation, maintenance and operation of IMAX theaters at Cinemark locations, and the marketing and commercial promotion of IMAX by Cinemark.

4.    From the onset of this relationship, Lee Roy Mitchell and Alan Stock, two principals of Cinemark, together with others at the company, professed an intent to become one of IMAX's biggest customers, to take an active role in promoting IMAX's unique combination of technology and entertainment services, and to maximize profits for both companies. Among other things, Cinemark represented that it would undertake to install IMAX systems in certain of Cinemark's domestic multiplexes of mutual interest to the parties, and to ultimately provide

2

IMAX an expansion opportunity into Latin American markets, where Cinemark touted a strategic presence.

5.      These representations were of value to IMAX, and IMAX relied to its detriment on Cinemark's statements by expressly holding open certain markets of interest to Cinemark, refusing to open those markets to other exhibitors, and, even more critically, by disclosing to Cinemark confidential and sensitive business information regarding the IMAX immersion theatres—their creation, design, operation, marketing and promotion—and all the details that set IMAX apart from all other industry participants.  Over the course of their relationship, the parties entered into agreements that formalized certain of Cinemark's representations.  Among its contractual obligations, for example, Cinemark agreed that it would not copy or reproduce IMAX systems, or disclose or misappropriate confidential information imparted by IMAX, and that it would affirmatively promote, and never dilute, the IMAX brand.

6.      IMAX has now discovered that, contrary to representations Cinemark made to IMAX, the parties' business relationship has been blatantly used by Cinemark to attempt to reproduce the entire, trademarked "IMAX Experience®" in the form of a product that Cinemark unveiled earlier this year and that Cinemark refers to as "Extreme Digital Cinema" and "Cinemark XD," or simply, "XD."  Whereas for years IMAX theatres have been widely marketed and promoted as having *"screen[s] that typically span from wall to wall and floor to ceiling ... and loudspeaker technology that ensures every theatre seat is in a good listening position,"* Cinemark has marketed and promoted its XD as a cinema with *"huge wall-to-wall screens, wrap around sound [to] ensure that every seat is an intense sensory experience."* As if that was not blatant enough, Cinemark, leaving no room to doubt its bad faith and intent, immediately began informing the market that XD is "just like" and in some instances, "better than" IMAX.  Cinemark has thus positioned itself as a direct competitor of IMAX, a fact starkly

3

underscored by Cinemark's referring to IMAX in public materials disseminated to investors as a "competing" company.

7.      Moreover, Cinemark has brazenly contacted Hollywood studios with which IMAX has its most critical and valuable ongoing or potential business relationships, and has deliberately promoted XD at IMAX's expense, sometimes referring disparagingly to IMAX as the "middleman" that should be "eliminated." These Hollywood studios are the source of virtually all of the films that IMAX relies upon for exhibition throughout its worldwide network. Cinemark has also replaced standard links relating to IMAX on Cinemark's web site with exclusive promotions for "Cinemark XD." Consistent with Cinemark's agreement to promote IMAX, the former links were designed by the parties to drive publicity and ticket sales for motion pictures at Cinemark's IMAX theaters.

8.      Remarkably, Cinemark has referred to XD in recent market disclosures as a "proprietary" system, while, tellingly, its financial statements reveal that Cinemark incurred no research and development costs in connection with its purported creation of XD. This stands in direct contrast to IMAX, which invested close to *$100 million* in just the last nine years to develop and bring to market its premium, immersive entertainment system. The magnitude of this number is underscored by the fact that IMAX's annual gross revenue is typically less than $150 million and the company's cash position at the end of 2008 was $27 million. Cinemark, on the other hand, has annual revenues of over $1.8 billion and cash on hand of close to $400 million.

9.      Adding insult to injury, Cinemark rebuffed IMAX's recent attempts to resolve its concerns about the XD product amicably. Tellingly, Cinemark responded to IMAX's multiple requests for a discussion between the parties by filing a preemptive patent action in Texas, notwithstanding that the parties had agreed to litigate any disputes in the courts of New York

4

State. Cinemark thus seeks to litigate in the same faithless manner in which it has conducted its business with IMAX.

10.    Although Cinemark XD has received mediocre reviews from some industry analysts and XD ultimately fails to deliver anything more than a substandard, bootleg version of The IMAX Experience®, Cinemark's actions have made its unlawful intentions and the resulting damage to IMAX crystal clear. Cinemark has committed numerous willful breaches of the parties' valid and binding agreements. It has fraudulently misrepresented its intentions to IMAX for the purpose of extracting confidential information of significant value to IMAX. Over a number of years, it has deliberately misappropriated that information, co-opting decades, and hundreds of millions of dollars worth of strategic research, development, operating, marketing, branding and promotional efforts by IMAX, and is now very publicly seeking to profit from its actions at IMAX's expense. In its latest act of consummate bad faith, Cinemark is purposefully and tortiously interfering with IMAX's existing and prospective economic relationships.

11.    IMAX respectfully requests that the Court award IMAX equitable relief and damages in an amount to be determined at trial, together with any other relief that the Court deems just and proper.

## PARTIES

12.    Plaintiff IMAX Corporation is a corporation organized under the laws of Canada, with its principal place of business at 110 E. 59th Street, New York, New York 10022. IMAX is one of the world's leading entertainment technology companies, specializing in the presentation of motion pictures as a unique, large-format, immersive experience. Since 1967, IMAX has dedicated significant time and resources, including hundreds of millions of dollars, to the research, development, creation and promotion of a highly proprietary entertainment experience that is designed to provide audiences with a feeling of total immersion, a concept that is entirely

5

IMAX's. The IMAX Experience® includes more than the company's proprietary technological innovations and its carefully calibrated placement and tuning of those components. IMAX has developed every aspect of its theatre systems over a period of several decades, together with a system of internal best practices and techniques designed to optimize its theaters. IMAX earns revenue primarily through the sale or lease of its systems to exhibitors. Customers of IMAX are typically standard motion picture exhibitors, like Cinemark, that own or operate complexes of commercial movie theaters, or multiplexes. Pursuant to its sale and lease agreements, IMAX shares confidential and proprietary information with its customers in order to ensure that the leased or purchased systems perform and are operated, marketed and promoted in accordance with the high standards developed by IMAX. In addition, the relationships that IMAX has fostered with Hollywood studios over a number of years are integral to its business model, as these studios provide the films that are exhibited throughout the IMAX network.

13.      Upon information and belief, Defendant Cinemark USA, Inc. is a corporation organized under the laws of the State of Texas, with its principal place of business at 3900 Dallas Parkway, Suite 500, Plano, Texas 75093. Cinemark is a motion picture exhibitor that owns or operates over 400 multiplex theaters throughout the United States and Latin America. Cinemark generates revenue primarily from box office receipts and concession sales. Cinemark generates additional revenues from screen advertising sales, vendor marketing programs, pay phones, ATM machines and electronic video games located in some of its theatres.

<u>JURISDICTION AND VENUE</u>

14.      This Court has jurisdiction over these claims under N.Y. CPLR § 301 and has personal jurisdiction over the defendants under N.Y. CPLR § 302, insofar as defendant Cinemark regularly transacts business within the State of New York, and the acts complained of caused injury to person or property within the State of New York. Moreover, defendant Cinemark has

6

submitted to the jurisdiction of this Court by agreeing in its contracts with IMAX to "attorn to

the jurisdiction of the courts of New York State."

15.    Venue is proper in this County under N.Y. CPLR § 501 and N.Y. CPLR § 503.

### THE RELATIONSHIP BETWEEN IMAX AND CINEMARK

16.    In the late 1990s, Ken Howarth, then Vice President of Marketing for the

Americas of IMAX, and Lee Roy Mitchell, then Chief Executive Officer of Cinemark, began

discussing the possibility of installing IMAX theatres in motion picture multiplexes owned by

Cinemark.

17.    At the time, Cinemark was considered to be a leading exhibitor of films within the

industry and thus, a possible source of business for IMAX.

18.    Mr. Mitchell directed the Cinemark team to work with IMAX and Mr. Howarth

towards the purchase or lease of IMAX's theatre systems.

19.    Though the discussions between the parties continued, IMAX found Cinemark

slow to respond to IMAX's proposals and several months passed without a formal agreement.

20.    In 1997, executives from IMAX met again with Mr. Mitchell and Alan Stock,

then the Head of Distribution of Cinemark and currently the Chief Executive Officer.

21.    Mr. Mitchell expressed disappointment over the fact that IMAX had leased a

theatre system in Houston, Texas to one of Cinemark's competitors.

22.    IMAX representatives explained to Mr. Mitchell that Cinemark had not pursued a

business relationship with IMAX, whereas other exhibitors were actively engaging IMAX in

negotiations to lease or purchase IMAX systems in the markets of interest to them.

23.    Due to the geographic exclusivity arrangements that IMAX grants to its

customers, it was not possible for IMAX to enter into a contract with Cinemark for a second

IMAX system in the desired Cinemark location in the Houston market.

7

24.     Mr. Mitchell expressed displeasure over the fact that Cinemark had allowed negotiations between the parties to stall and renewed his intent to enter into a large deal with IMAX, and to form a significant, long-term relationship with IMAX.

25.     Cinemark represented to IMAX that it wanted to become one of IMAX's biggest customers and, following consultation with others at Cinemark, Mr. Mitchell proposed an arrangement whereby Cinemark would lease IMAX's proprietary theatre systems and operate IMAX theatres at twelve of Cinemark's existing and future multiplex locations.

26.     Cinemark further represented that it would take an active role in promoting IMAX's unique combination of technology and entertainment services, and that it would undertake to maximize profits for both companies.

27.     Cinemark represented that it would install IMAX systems in certain of Cinemark's domestic multiplexes that were of mutual interest to the parties.

28.     To entice IMAX further, Cinemark represented that Cinemark could provide expansion opportunities for IMAX into markets in Latin America, where Cinemark already had a strategic and significant presence and further development plans.

29.     IMAX attributed specific value to Cinemark's access to theatre locations in Latin America, as it was business opportunity that other exhibitors could not offer.

30.     In 1997, IMAX agreed to grant Cinemark a three-year period of exclusivity for three Latin American markets in particular: Sao Paolo, Mexico City and Buenos Aires.

31.     On or about October 21, 1997, IMAX and Cinemark executed a letter agreement (the "Letter Agreement") whereby IMAX agreed to lease Cinemark twelve proprietary IMAX theatre systems.

8

32.     The Letter Agreement incorporates by reference a Lease Agreement (the "Lease Agreement" and together, the "Agreements") which provides the additional terms and conditions governing the relationship between IMAX and Cinemark.

33.     In relevant part, Cinemark was expressly bound by the Agreements "not [to] modify, copy or reproduce in any way or manner the System [leased to it by IMAX] or any part or component thereof."

34.     Cinemark agreed "not [to] give any assistance by way of information, financial aid or technical support or in any other manner whatsoever to parties other than Imax, . . . which might adversely affect the validity or enforceability of either of the [IMAX] Trademark or any other trademark, patent, trade secret or confidential information of Imax unless compelled by due process of law and upon prior written notice to Imax."  Cinemark was obligated to keep confidential the terms of its agreements with IMAX, as well as any information it received from IMAX in connection therewith.

35.     Cinemark agreed that it would not "disclose any information, data, plans or specifications of a confidential nature concerning the System, during the Term or at any time thereafter, including, . . . any designs, drawings, technical specifications or other such information, service manuals, commercial data or quotations, including . . . this Agreement, to any person, firm or corporation or aid, assist or permit any person, firm or corporation in obtaining knowledge of the working mechanism of any part of the System other than such as may be necessary for the competent operators trained or approved by Imax to operate the System, or as may be required by law."

36.     Cinemark was contractually required to notify IMAX in the event of "any possible modifications or improvements to the System" that Cinemark had leased from IMAX, and [to] grant IMAX a right of first refusal "to acquire, . . . an exclusive, transferable world-wide

9

license in perpetuity, to use, manufacture, have manufactured and sell any apparatus, articles or methods embodying any such modifications or improvements from the date on which Imax is advised of such modifications or improvements."

37.    Cinemark agreed to exhibit, at the beginning of each presentation using the IMAX system, an IMAX branding leader supplied by IMAX. Additionally, Cinemark agreed to exhibit, on a regular basis, an IMAX theatrical trailer promoting the IMAX theatre and experience, and coming attractions for IMAX presentations.

38.    Cinemark agreed to use the IMAX trademarks in the name of each theatre using an IMAX system, and to use or display the trademarks in a conspicuous manner in all media advertising and other promotional material for the theatre. In doing so, Cinemark also agreed to not use any trademarks, derivations or words which are confusingly similar to the IMAX trademarks, or which may detract from the distinctiveness of the IMAX trademarks.

39.    The Agreements further contemplated the incorporation of IMAX into Cinemark's Latin American business and acknowledged the exclusivity period that IMAX had given Cinemark.

40.    The parties amended the Agreements and entered into additional lease and sale arrangements in 1998, 2001 and 2004. None of the modifications, amendments or later agreements altered the contractual obligations of Cinemark as to confidentiality, promotion of IMAX, and the express prohibition on any efforts by Cinemark to modify, reproduce or copy IMAX.

41.    Following the parties' execution of the Agreements, IMAX disclosed to Cinemark proprietary, confidential and sensitive business information, as well as best practices and techniques regarding every aspect of IMAX's immersion theatre and the overall IMAX experience. As the pioneer of large-format theaters, IMAX has, over the decades, accumulated

10

not just a myriad of technical know-how, but also operating, branding, marketing and promotional knowledge with respect to such theaters. This data was all imparted to Cinemark.

42.     For example, IMAX provided extensive training on IMAX's systems to Vincent Holloway, a Cinemark technician, in 1997, 2003 and 2005. The training occurred at an IMAX facility in Mississauga, Canada, where IMAX conducts multi-week tutorial programs for its customers. During the training sessions, technicians like Mr. Holloway receive the confidential and proprietary information necessary to create IMAX's immersive theatre environment, including, for example, instruction on the operation of the different components of an IMAX system, and recommended best practices and techniques for how best to optimize the performance of a large-format, total immersion entertainment system. Through Mr. Holloway, Cinemark was taught how to create, operate, maintain, brand, and market a large-format theatre experience, literally from A to Z.

43.     Throughout the parties' relationship, Cinemark continued to represent that it was interested in adding IMAX theatres to additional Cinemark locations within the Americas. IMAX held open certain markets of interest to Cinemark and did not lease or sell IMAX systems to other exhibitor chains at those locations.

44.     In 2000, for example, IMAX agreed to give Cinemark two three-month extensions on the three-year exclusivity period that it had granted Cinemark for the Sao Paolo, Mexico City and Buenos Aires markets. Due to IMAX's belief that Cinemark was acting in good faith, IMAX informed other customers that it could not enter into contracts for those markets during that time and lost the ability to do business with other clients.

45.     Despite repeated inquiries from IMAX regarding opportunities for the two companies to install IMAX theatres at Cinemark locations in Latin America, Cinemark repeatedly informed IMAX that Cinemark was still in the process of developing those markets

11

and that it would bring IMAX in when appropriate. Cinemark never made good on its representations regarding Latin America.

46.     All the while, Cinemark continued to profess an intent to expand with IMAX domestically. As recently as 2008, Cinemark requested a list of proposed locations for additional IMAX large-format theatres within the Cinemark network. In good faith, IMAX did the market analysis, identified several Cinemark locations that would offer the most lucrative prospects for a large-format theatre, responded with a compilation of twelve options and held back from leasing IMAX theatres in certain of those markets to other customers.

47.     As IMAX was about to learn, however, Cinemark's statements were nothing more than below-board tactics designed to buy Cinemark more time to gather information regarding IMAX's immersion theatres and how to create, design, operate, brand, market and promote them.

48.     Cinemark has not purchased or leased any additional IMAX theatres since 2004.

49.     IMAX has performed and continues to perform all of its obligations under the Agreements.

## CINEMARK REVEALS ITS TRUE INTENTIONS

50.     Contrary to representations Cinemark made to IMAX, Cinemark has misused the parties' business relationship to attempt to create an unauthorized reproduction of the trademarked IMAX Experience®, which Cinemark refers to as "Extreme Digital Cinema" and "Cinemark XD," or simply, "XD." Cinemark never had any intent to honor the representations it made to IMAX.

51.     Cinemark unveiled XD earlier this year and has described it as a cinema with *"huge wall-to-wall screens, wrap around sound [to] ensure that every seat is an intense sensory experience,"* a virtual carbon copy of IMAX's marketing slogan: *"screen[s] that*

12

*typically span from wall to wall and floor to ceiling ... and loudspeaker technology that*
*ensures every theatre seat is in a good listening position."*

52.　　Removing any remaining doubt about their intentions, Cinemark has informed the
public that the XD theatre is "just like IMAX"; on some occasions they've even promoted their
makeshift theaters as "better than" IMAX.

53.　　In a display of bad faith and in direct breach of its contractual obligations,
Cinemark has intentionally copied the IMAX immersion theatre.  Is has consciously and
deliberately launched XD as a direct competitor of IMAX; it makes no bones about referring to
IMAX in their public materials disseminated to investors as a "competing" company.

54.　　Indeed, Cinemark has announced plans to roll-out its XD theaters at *eight of the*
*very locations identified by IMAX* in response to Cinemark's 2008 request for possible sites
for IMAX large format systems.

55.　　Cinemark has directly contacted Hollywood studios with which IMAX has its
most critical and valuable ongoing and potential business relationships.  Cinemark has done so to
promote Cinemark XD at IMAX's expense, referring disparagingly to IMAX as, among other
things, the "middleman" that needs to be "eliminated."   Knowing full well that IMAX has
significant business relationships with those Hollywood studios and that IMAX's existence
depends on these relationships, Cinemark is actively encouraging the studios to enter into
contracts with Cinemark to "eliminate the middleman."

56.　　Cinemark has even gone as far as to replace standard links relating to IMAX on
Cinemark's web site with exclusive promotions for "Cinemark XD."  Consistent with
Cinemark's agreement to promote IMAX, the former links were designed by the parties to drive
publicity and ticket sales for motion pictures shown at Cinemark's IMAX theatres.

13

57.     Upon information and belief, Cinemark has further disclosed to third parties "information data, plans [and] specifications of a confidential nature" belonging to IMAX in connection with the unauthorized reproduction of IMAX systems. Cinemark has provided assistance by way of information to parties other than IMAX, which has adversely affected the validity or enforceability of IMAX's trade secrets and confidential information.

58.     On or about November 5, 2009, Cinemark held an event at one of its San Francisco theatre locations to "roll-out" XD to the major Hollywood studios. Upon information and belief, Cinemark is having an event to promote its XD theatre to its stock analysts in Plano, Texas on November 12, 2009. Many of these stock analysts also cover IMAX; Cinemark has been promoting its XD theatre to these analysts (as well as to the Hollywood studios and the movie-going public) as competitive, and even superior, to IMAX, which has bolstered Cinemark's stock and harmed IMAX's.

## CINEMARK RACES TO THE COURTHOUSE

59.     On October 26, 2009, Robert D. Lister, Senior Executive Vice President and General Counsel to IMAX, called Michael Cavalier, General Counsel to Cinemark, in a good faith effort to discuss what IMAX believes to be Cinemark's wrongful use of two of IMAX's patents and the replacement of links relating to IMAX on Cinemark's web site with exclusive promotions for "Cinemark XD." Mr. Lister followed up this call with e-mail again asking for an opportunity to discuss this with Cinemark.

60.     Instead of a return phone call or email, however, Cinemark responded to Mr. Lister's efforts by rushing to file a preemptive lawsuit in the United States District Court for the Eastern District of Texas, a forum in which the parties had agreed not to litigate. While aggressive and discourteous, Cinemark's preemptive federal suit turns out to be remarkably consistent with Cinemark's past behavior as a duplicitous partner.

14

61.    Cinemark seeks a declaration that it has not infringed upon two of IMAX's patents, and, in the alternative, that the two IMAX patents are invalid.

62.    The claims set forth in this Complaint are based on common law causes of action that exist independent of any patents owned by IMAX, and arise from Agreements that contain New York State choice of law and forum selection provisions.

63.    Contemporaneous with the filing of this Complaint, IMAX is sending Cinemark a notice of default under the Agreements.

## AS AND FOR A FIRST CLAIM AGAINST CINEMARK

### (Fraud and Fraudulent Inducement)

64.    Plaintiff IMAX repeats and realleges the allegations in paragraphs 1 through 63 as if fully set forth herein.

65.    In order to induce IMAX to enter into the Agreements and to disclose confidential and sensitive information to Cinemark, Cinemark made misrepresentations of material fact.

66.    Cinemark made such misrepresentations of material fact, set forth above, with the intent to deceive and defraud IMAX, and in knowing or reckless disregard of their falsity.

67.    In reasonable reliance on Cinemark's misrepresentations, and in ignorance of the true facts, IMAX was induced to enter into the Agreements. Had the material misrepresentations not been made, IMAX would not have done so.

68.    At the time the parties entered into the Agreements, Cinemark had no present intention of honoring its contractual obligations or other representations to IMAX.

69.    As a direct and foreseeable result of the above-described actions of Cinemark, IMAX has suffered damages in an amount (plus interest) to be determined at trial.

15

70.    In addition, Cinemark acted maliciously, willfully and wantonly and with conscious disregard of the rights of IMAX. Accordingly, IMAX is entitled to punitive damages in an amount to be determined at trial.

### AS AND FOR A SECOND CLAIM AGAINST CINEMARK

### (Breach of Contract)

71.    Plaintiff IMAX repeats and realleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

72.    The Agreements between Cinemark and IMAX are valid and binding contracts.

73.    Cinemark materially breached the Agreements by, among other things: (i) copying and reproducing the IMAX theatre system and the means to brand, market and promote a large format system, (ii) disclosing information, data, plans and specifications of a confidential nature concerning the IMAX theatre systems, (iii) developing modifications to the IMAX's system without notifying IMAX, (iv) disparaging, harming and diluting the IMAX brand and trademark and (iv) acting in a manner that adversely affects the validity and enforceability of IMAX's trade secrets and confidential information.

74.    IMAX was foreseeably injured as a result of Cinemark's breach of the Agreements.

75.    Throughout the period covered by the Agreements, IMAX has fully complied with all of its legal and contractual obligations under the Agreements.

76.    As a direct and foreseeable result of the above-described actions of Cinemark, IMAX has suffered direct, incidental, and consequential damages (plus interest) in an amount to be determined at trial, together with any other damages provided for by the Agreements.

77.    In addition, as provided by the Agreements, IMAX is entitled to punitive damages in an amount to be determined at trial.

16

## AS AND FOR A THIRD CLAIM AGAINST CINEMARK

### (Breach of Covenant of Good Faith and Fair Dealing)

78.     Plaintiff IMAX repeats and realleges the allegations in paragraphs 1 through 77 as if fully set forth herein.

79.     Cinemark owed IMAX an obligation of good faith and fair dealing in connection with the Agreements.

80.     By engaging in the aforementioned conduct, Cinemark breached the covenant of good faith and fair dealing that is implied in the Agreements.

81.     Throughout the period covered by the Agreements, IMAX has fully complied with all of its legal and contractual obligations under the Agreements.

82.     As a direct and foreseeable result of the above-described actions of Cinemark, IMAX has suffered direct, incidental, and consequential damages (plus interest) in an amount to be determined at trial.

## AS AND FOR A FOURTH CLAIM AGAINST CINEMARK

### (Misappropriation of Trade Secrets)

83.     Plaintiff IMAX repeats and realleges the allegations in paragraphs 1 through 82 as if fully set forth herein.

84.     IMAX's confidential and proprietary information regarding the IMAX theatre system, The IMAX Experience®, and how to create, operate, market and promote a large format theatre constitute trades secrets which Cinemark acquired under circumstances giving rise to a duty to maintain their secrecy—the confidentiality covenants in the Agreements.

85.     IMAX's confidential and proprietary information has economic value in so far as it is generally not known to the public and has provided IMAX with a commercial advantage over its competitors.  IMAX has made, and continues to make, diligent efforts to protect its trade

17

secret information, including, for example, the confidentiality agreements IMAX asks all of its clients to agree to.

86.    Cinemark has misappropriated IMAX's confidential and proprietary information through improper means as described herein in connection with copying IMAX's theatre systems.

87.    Cinemark has gained substantial benefit from its use of IMAX's confidential and proprietary information.

88.    Cinemark's wrongful conduct in misappropriating and using IMAX's confidential and proprietary information has damaged IMAX, for which there is no adequate remedy at law.

89.    Among other things, IMAX is entitled to an injunction prohibiting Cinemark from producing, using and selling its XD system.

90.    In the alternative, IMAX in entitled to damages in an amount (plus interest) to be determined at trial.

## AS AND FOR A FIFTH CLAIM AGAINST CINEMARK

### (Tortious Interference with Contract and Prospective Economic Relations)

91.    Plaintiff IMAX repeats and realleges the allegations in paragraphs 1 through 90 as if fully set forth herein.

92.    IMAX has valid contracts and ongoing relationships with nearly all of the leading motion picture studios in the United States (the "Hollywood Studios").

93.    Cinemark has knowledge of IMAX's contracts and ongoing relationships with the Hollywood Studios.

94.    Cinemark is intentionally interfering with IMAX's contracts and ongoing relationships by contacting Hollywood Studios and requesting that IMAX be eliminated.

18

95.     Cinemark's tortious interference is resulting in lost opportunities with the Hollywood Studios, for which there is no adequate remedy at law.

96.     Among other things, IMAX is entitled to an injunction prohibiting Cinemark from interfering with IMAX's relationships with Hollywood Studios.

97.     In the alternative, IMAX in entitled to damages in an amount (plus interest) to be determined at trial.

98.     In addition, Cinemark acted maliciously, willfully, and wantonly and with conscious disregard of the rights of IMAX.  Accordingly, IMAX is entitled to punitive damages in an amount to be determined at trial.

## AS AND FOR A SIXTH CLAIM AGAINST CINEMARK

### (Unjust Enrichment)

99.     Plaintiff IMAX repeats and realleges the allegations in paragraphs 1 through 98 as if fully set forth herein.

100.    By copying IMAX's theatre systems and its methods for operating, branding, marketing and promoting large format theatre systems, Cinemark unjustly received benefits and continues to realize benefits at the expense of, and without compensating, IMAX.

101.    As a direct and foreseeable result of the above-described actions of Cinemark, IMAX has suffered damages (plus interest) in an amount to be determined at trial.

19

WHEREFORE, plaintiff IMAX respectfully demands that defendant Cinemark be served and cited to appear and answer in this action, and after a trial on the merits, that this Court issue and order and judgment:

A.    awarding IMAX equitable relief as requested herein;

B.    awarding IMAX full compensatory damages in an amount to be determined at trial;

C.    assessing appropriate punitive and exemplary damages due to IMAX;

D.    awarding IMAX pre- and post-judgment interest as allowed by law; and

E.    granting such other relief as may be appropriate, and as the Court deems just and proper.

Dated:    New York, New York
          November 11, 2009

SHEARMAN & STERLING LLP

By:    _____
       Alan S. Goudiss
       Kristen M. Fitzmaurice
       David I. Wishengrad
       Alexander J. Marcopoulos

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022-6069
(212) 848-4000

*Attorneys for Plaintiff IMAX Corporation*

20

## VERIFICATION

STATE OF NEW YORK    )
                           ) ss.:
COUNTY OF NEW YORK   )


**ROBERT D. LISTER**, being duly sworn, deposes and says:

I am the Senior Executive Vice President and General Counsel to IMAX

Corporation ("IMAX"), the plaintiff in this action. I have read the foregoing Complaint and

know the contents thereof to be true, except as to matters therein alleged upon information and

belief. As to those matters, I believe them to be true.

                                                        Robert D. Lister

Sworn to before me
this 11th day of November, 2009.


Notary Public

BRYAN JANKAY
Notary Public, State of New York
No. 01JA6172051
Qualified in Nassau County
Certificate filed in New York County
Commission Expires August 6, 20 11

NYDOCS04/514546.1

Index No.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IMAX CORPORATION,

Plaintiff,

v.

CINEMARK USA, INC.,

Defendant.

SUMMONS AND
VERIFIED COMPLAINT

SHEARMAN & STERLING LLP
599 LEXINGTON AVENUE
NEW YORK, N.Y. 10022-6069
(212) 848-4000